## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**UNITED STATES OF AMERICA**              **CASE NO.  6:19-CR-00046-01**

**VERSUS**                                **JUDGE DOUGHTY**

**RASHEED RIDEAUX (01)**                  **MAGISTRATE JUDGE WHITEHURST**

### REPORT AND RECOMMENDATION

Before the Court is Defendant's Motion to Suppress, First Supplemental Motion to Suppress, and Second Supplemental Motion to Suppress. (Rec. Doc. 31; 41; 50). The Government opposed the Motions. (Rec. Doc. 32; 44; 51). The Motion was referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of this Court.  Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, the Court recommends that Defendant's Motion be GRANTED.

### Factual Background

Defendant was indicted on February 13, 2019 for receiving a bribe by a public official. (Rec. Doc. 1). He appeared and was arraigned on March 12, 2019. (Rec. Doc. 9). He filed his original Motion to Suppress on October 30, 2019, followed by First and Second Supplemental Motions in November 2019 and February 2020, respectively. Defendant's three Motions seek dismissal of evidence obtained by

federal agents on December 17, 2018. Following multiple continuances due to the Covid-19 pandemic, the Court conducted an evidentiary hearing on March 31, 2021. (Rec. Doc. 81). Upon Defendant's motion, the Court re-opened the evidentiary hearing on June 17, 2021. (Rec. Doc. 86; 87; 92). The evidence in the record establishes the following facts.

On December 14, 2018, Special Agent Kathleen Alwell with the Office of the Inspector General (OIG) of the United States Postal Service (USPS) received information that twelve boxes containing suspected narcotics were bound to Joshua Joseph at 720 S. Oak Street in Opelousas, Louisiana. (Rec. Doc. 81, p. 12). The twelve boxes were similarly packaged from the same sender, General Tools and Equipment, with a false California return address and addressed to three or four different tenants. (Rec. Doc. 81, p. 68-69). The boxes were also suspicious because they were taped at all seams and postage was paid in cash. (Rec. Doc. 81, p. 72-73; 82-83; Rec. Doc. 68-2).

Agent Alwell took custody of the boxes from the Baton Rouge facility and arranged to have them delivered on December 17, 2018 when the St. Landry Parish Sheriff's Office (SLPSO) was available to assist. (Rec. Doc. 81, p. 13). On the scheduled date, Agent Alwell placed eleven of the twelve packages back into the mail stream for delivery in Opelousas. She retained the twelfth package for a canine

sniff by a certified drug detection canine with the SLSO. The drug dog alerted on the twelfth package, indicating that it contained narcotics. (Rec. Doc. 81, p. 13-14).

On December 17, 2018, Defendant was a USPS mail carrier assigned to Route 5 in Opelousas, where the packages were to be delivered. Agent Alwell learned that Defendant had left early for his route that day and delivered the first eleven packages. (Rec. Doc. 81, p. 14). Agent Alwell also knew that Defendant had previously diverted suspicious packages from their written addresses. (Rec. Doc. 81, p. 67-68; 82). Defendant delivered the packages (addressed to 720 S. Oak Street) to 425 Carrier Street. (Rec. Doc. 81, p. 15; 92). Shortly thereafter, Agent Alwell and other Special Agents conducted a stop of Defendant's postal vehicle by approaching the parked vehicle and removing the keys from the ignition. (Rec. Doc. 81, p. 92-93; Rec. Doc. 92, p. 51). The agents were armed at the time, though the evidence is inconclusive as to whether their firearms were visible. Compare Agent Alwell's testimony at Rec. Doc. 81, p. 54 and Defendant's testimony at Rec. Doc. 92, p. 53.

Upon stopping Defendant, Special Agent Brandon Tullier verbally advised Defendant of his Miranda rights (Rec. Doc. 81, p. 16; 23; 53; 84; 94-95),[1] and Defendant was patted down (Rec. Doc. 92, p. 53). During the stop, Defendant

---

[1]     Defendant testified that he did not recall waiving his Miranda rights at the time of the stop (Rec. Doc. 92, p. 54); however, the Court finds that the evidence supports a finding that Defendant was verbally advised of his Miranda rights at the time of the stop. See Rec. Doc. 81, p. 84; 94-95; Rec. Doc. 67-1, p. 15, line 20-24,

allowed the agents to search his cell phone for communications between himself and the individual who received the packages. (Rec. Doc. 81, p. 16-17; 96; Rec. Doc. 92, p. 54-55). Defendant provided the agents the code to open his phone to view the texts; however, his consent at that time was limited only to texts between Defendant and the individual in question, who Defendant identified as Ja'Relle or Da'Relle (later referred to in the proceedings and hereinafter as "Johnson"). (Rec. Doc. 81, p. 17; 32. See also p. 38-39; Rec. Doc. 92, p. 55). At that time, the agents video-recorded Defendant's phone as they read the text messages between Defendant and the individual. (Rec. Doc. 67-2). During that video, Defendant asks for his phone back, but an agent says no. Another agent tells Defendant to "sit down" and "relax," because he is "too ramped up." (Rec. Doc. 67-2; 67-3). Defendant testified that an agent physically guided him to sit on the bumper of a vehicle. (Rec. Doc. 92, p. 56-57).

The video-taped text messages reveal that Defendant communicated with the individual later identified as "Johnson" regarding delivery of multiple packages beginning at least one month prior to the stop. During their communications, Johnson tells Defendant that he is expecting various packages, some at 720 S. Oak St. and some at 304 W. Tennis Street, on several dates. Johnson also tells Defendant that he changes his phone number every few months. Defendant arranges with

Johnson to have the various packages delivered to or picked up by Johnson. (Rec. Doc. 81, p. 31-32; Rec. Doc. 67-2).

Following the traffic stop, Defendant was handcuffed, placed in the back of one of the agent's vehicles, and taken by agents back to the post office for further questioning. (Rec. Doc. 81, p. 17; Rec. Doc. 92, p. 57-58). According to Agent Alwell, standard procedure for OIG investigations requires that any individual being transported be handcuffed; however, Agent Alwell testified that Defendant was not "arrested" at any point that day. (Rec. Doc. 81, p. 17-18; 30; 101). The postal vehicle Defendant was operating was property of the USPS and subject to inspection and search at any time. (Rec. Doc. 81, p. 18). Agent Alwell further testified that Defendant was not free to walk away from the traffic stop. As a postal employee, he had to be taken back to the post office to finalize things with postal management. Per OIG protocol, he would have been handcuffed, placed in a government vehicle, and brought back to the post office, where he would meet with management and be put on emergency placement. (Rec. Doc. 81, p. 63-65; 98). Agent Alwell later testified that had Defendant not agreed to speak with agents, they could have left him at the stop, but Defendant never indicated that he would not speak with them. (Rec. Doc. 81, p. 85).

At the post office, Defendant was again advised of his Miranda rights and executed a form waiving those rights. (Rec. Doc. 81, p. 18-24; Rec. Doc. 67-1, p.

15-18; Rec. Doc. 69-1). According to Agent Alwell, Defendant then admitted delivering the packages other than as addressed and that he had received money on at least three occasions for doing so; however, neither party submitted the entire transcript of the December 17, 2018 interview. (Rec. Doc. 81, p. 24). The limited transcript provided reveals only that Defendant stated he did not know what was in the packages. (Rec. Doc. 67-1, p. 20).

Following questioning at the post office, Defendant was directed to the SLPSO for further questioning. (Rec. Doc. 81, p. 25). Defendant agreed to go to the SLPSO to have his phone "dumped," so that he could get his phone back sooner. (Rec. Doc. 81, p. 26-29; 35; 50; Rec. Doc. 69-3; Rec. Doc. 69-2; Rec. Doc. 92, p. 76-77). He drove his personal vehicle to the SLPSO and was escorted by OIG agents. (Rec. Doc. 81, p. 102; Rec. Doc. 92, p. 61-62). Thereafter, SLPSO took over questioning. (Rec. Doc. 81, p. 30). Defendant could have chosen not to report to the SLPSO, but he agreed to go in order to get his phone back. (Rec. Doc. 81, p. 30; 102-103. See also Rec. Doc. 92, p. 65).

Agent Alwell testified that a mail carrier is only permitted to deliver a package to a different address if there is a written agreement with the customer or if the mail carrier knows the customer who asks that a package be delivered to a different individual. (Rec. Doc. 81, p. 44-46; 70). Defendant's witness, Susan Chretien, a mail carrier in Opelousas for many years, similarly testified that mail carriers frequently

deliver mail or packages to individuals who are not named on the address label based on their familiarity with the customer. (Rec. Doc. 92, p. 35-37). The evidence is conflicting as to whether Defendant personally knew Johnson. Compare 1) Rec. Doc. 81, p. 89, wherein Agent Alwell testified that Defendant told her he did not know Johnson, 2) Defendant's text messages at Rec. Doc. 67-2, indicating an ongoing relationship vis-à-vis delivery of packages and a colloquy regarding Defendant's wife's health; and 3) Defendant's statement to the agent's during the December 17, 2018 interview indicating that he did not have a relationship with Johnson meaningful enough to inquire as to the packages' contents (Rec. Doc. 67-1, p. 20). Agent Alwell further testified that mail carriers may receive no more than $20 as a gift from customers (Rec. Doc. 81, p. 70-71); however, Ms. Chretien, testified that mail carriers often get much more from their customers (Rec. Doc. 92, p. 41).

## **Law and Analysis**

Defendant's Motion to Suppress invokes the exclusionary rule, as it seeks to preclude the Government from introducing certain evidence at trial. "The exclusionary rule was created by the Supreme Court to 'supplement the bare text' of the Fourth Amendment, which 'protects the right to be free from 'unreasonable searches and seizures,' but ... is silent about how this right is to be enforced.'" *United States v. Ganzer*, 922 F.3d 579, 584 (5th Cir.), *cert. denied,* 140 S. Ct. 276 (2019),

citing *Davis v. United States*, 564 U.S. 229, 231 (2011). The exclusionary rule operates to exclude the prosecution from introducing evidence obtained unconstitutionally. *Id*. Its purpose is to deter officer misconduct, not to redress injury to the victim of a constitutional violation or to address judicial errors or misconduct. *Id*., citing *Davis v. United States*, 564 U.S. 229, 236-37 (2011), and *United States v. Leon*, 468 U.S. 897, 916 (1984). Thus, the Supreme Court recognized a good faith exception to the exclusionary rule, which allows admission at trial of "evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate" but later invalidated. *Id*. citing *Leon*.

Generally, "the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). In cases such as this, where the officer acted without a warrant, the Government bears the burden of proof. *Id; United States v. Castro*, 166 F.3d 728, 733, fn. 6 (5th Cir. 1999).

Defendant challenged the agents' warrantless search of his two cellphones, his personal bag, and truck, as well as his written and oral statements to agents, on the grounds that the agents lacked probable cause and that Defendant did not give valid consent for the searches. The Government stipulated that it will not use any of the evidence discovered from these items, with the exception of text messages between Defendant and Johnson, in its case in chief. (Rec. Doc. 32; Rec. Doc. 81, p.

8

38-39). Thus, the Court must determine whether Defendant was constitutionally detained during the initial stop, whether Defendant gave valid consent for the agents to search his phone, whether Defendant was arrested following the stop, and, if so, whether the arrest was supported by probable cause.

## I.    Validity of the initial encounter.

Defendant's first theory attacks the validity of the agents' initial interaction with Defendant as not supported by probable cause. "A search and seizure of a person must be based on probable cause particularized with respect to that person unless a constitutionally adequate substitute for probable cause exists." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 208 (5th Cir. 2009). Of course, constitutional protections do not apply to non-arrest situations.

The Fifth Circuit has recognized three types of encounters between officers and individuals: 1) a consensual encounter during which an individual voluntarily agrees to communicate with the police; 2) a limited investigatory stop based upon less than probable cause [A *Terry* stop]; and 3) an arrest which constitutes a seizure under the Fourth Amendment. *United States v. Williams*, 365 F.3d 399, 403–04 (5th Cir. 2004), citing *United States v. Cooper,* 43 F.3d 140, 145–46 (5th Cir.1995).

The Court does not find that a consensual encounter occurred, because the evidence shows that agents approached Defendant's parked postal vehicle, took the keys from the ignition, and instructed Defendant to answer questions. See *Williams*,

365 F.3d at 404; *Bostick*, 501 U.S. at 434 (1991), citing *Florida v. Royer,* 460 U.S. 491, 497 (1983). The brief video in which an agent videos the text thread between Defendant and Johnson depicts multiple agents, one of whom is holding his phone over Defendant's objection, and one of whom directs him to sit down. (Rec. Doc. 67-2).

Because the initial encounter was not consensual, the Court must determine whether the postal agents were justified in conducting a limited investigatory stop based on reasonable suspicion, a standard less than probable cause.

> The reasonableness of traffic stops and investigative detentions of persons suspected of criminal activity is evaluated through a two-step inquiry under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Stevens,* 487 F.3d 232, 244 (5th Cir.2007). First, we determine whether stopping the vehicle was initially justified by reasonable suspicion. Second, we evaluate whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. In the context of a traffic stop, once an officer's initial suspicions "have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Estrada,* 459 F.3d 627, 631 (5th Cir.2006).

*United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013).

Applying the foregoing two-step analysis, the Court must first determine whether the agents' initial detention of Defendant was justified by reasonable suspicion. The evidence supports that at the time the agents approached Defendant on his mail route, removed the keys, and advised him to answer questions, the agents knew 1) the packages in question were suspicious because of their false return

10

addresses, completely taped seams, origination from a source state (California), and postage fees paid in cash; 2) a narcotics canine alerted to the presence of drugs in one of the packages; and 3) Defendant had on prior occasions diverted suspicious packages from their written addresses. (Rec. Doc. 81, p. 68-69; 72-73; 82-83). The Court finds that these facts support the agents' reasonable suspicion that Defendant was potentially involved in a drug trafficking crime. See e.g. *United States v. Daniel*, 982 F.2d 146, 150 (5th Cir. 1993) (discussing common drug package profiles); and further *United States v. Walker*, 824 F. App'x 124, 125–26 (3d Cir. 2020) in which the defendant worked with a mail carrier to divert packages containing drugs.

Under the second step, if the initial stop was justified based upon reasonable suspicion, the court must determine whether "(1) the facts that emerge during the police officer's investigation of the original offense create reasonable suspicion that additional criminal activity warranting additional present investigation is afoot, (2) the length of the entire detention is reasonable in light of the suspicious facts, and (3) the scope of the additional investigation is reasonable in light of the suspicious facts, meaning that it is reasonable to believe that each crime investigated, if established, would likely explain the suspicious facts that gave rise to the reasonable suspicion of criminal activity." *United States v. Pack*, 612 F.3d 341, 358 (5th Cir.), *opinion modified on denial of reh'g,* 622 F.3d 383 (5th Cir. 2010).

In their efforts to verify or dispel suspicions that Defendant was involved with the drug delivery scheme, agents obtained Defendant's consent to search his cellphone; however, the consent was limited to Defendant's communications with the individual who requested that the packages be diverted. The text messages revealed Defendant's ongoing communications with Johnson for at least the prior month regarding delivering multiple packages (which the agents knew to be suspicious, and at least one of which was confirmed to have contained drugs) to multiple addresses. Assuming for the immediate purposes that Defendant's limited consent was valid (further discussed below), the Court finds that the initial detention was reasonable in order for the agents to confirm Defendant's relationship to the packages' recipient. Hence, the agents' initial stop and detention was constitutional. Whether Defendant's subsequent handcuffing and transportation to the post office for further questioning was constitutional is a separate issue, discussed below.

## II.    **Validity of Defendant's Consent to Search.**

The Government justifies the agents' searches of Defendant's cell phone based on his consent for agents to review his text messages with Johnson. To determine whether consent was validly given, the court asks (1) whether consent was voluntary and (2) whether it was an independent act of free will. *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006).

## A. <u>Whether Defendant's consent was voluntary.</u>

In determining the voluntariness of consent under the first step, the court considers the following factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Id.*

The evidence suggests that, although Defendant was approached by agents, who took the keys from the postal vehicle, Defendant was cooperative. The brief video, though far from conclusive, shows that Defendant appears to be moving about freely, though he is agitated. There was no evidence that he was handcuffed at the time, and the evidence is inconclusive as to whether the agents' firearms were visible. Agent Tullier had advised Defendant of his Miranda rights (including his right to remain silent), and Defendant chose to speak with the agents anyway. The fact that Defendant limited his consent to search only his text messages with Johnson is indicative of his belief that incriminating evidence would not be found. Thus, based on the above factors, the Court finds that Defendant's limited consent was voluntary.

**B. <u>Whether Defendant's consent was an independent act of free will.</u>**

The Court must consider the second prong of the analysis when illegal conduct, such as an illegal detention, has occurred. "The purpose of this inquiry is to determine whether there was a 'break in the causal chain' between the constitutional violation and the consent; that is to say, consent cannot be the product of the illegal detention." *Id*. citing *United States v. Santiago,* 310 F.3d 336, 343 (5th Cir.2002). As discussed above, having found that Defendant's initial detention was constitutional, the Court need not address the second step. As such, the Court finds that Defendant's limited consent to search his text messages with Johnson was valid.

**III.    <u>Whether Defendant was arrested after the initial detention.</u>**

The agents repeatedly testified that Defendant was not arrested on the date in question. Rather, the Government contends that Defendant was merely detained when he was handcuffed pursuant to OIG protocol and brought to the post office for further questioning. The Supreme Court discussed the difference between a *Terry* detention and an arrest, or seizure, implicating Fourth Amendment protections as follows:

> A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" This test is derived from Justice Stewart's opinion in *United States v. Mendenhall,* 446 U.S. 544, which gave several "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to

14

leave," including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

*Kaupp v. Texas*, 538 U.S. 626, 629–30, 123 S. Ct. 1843, 1845–46, 155 L. Ed. 2d 814 (2003) (cleaned up).

Simply stated, "[a]n arrest occurs when, in view of the all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Lincoln v. Turner*, 874 F.3d 833, 841 (5th Cir. 2017) (cleaned up). "This is a fact-specific inquiry." *Id.*

The Court recognizes that "drawn guns and handcuffs do not necessarily convert a detention into an arrest." *United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999). See also *Angulo v. Brown*, 978 F.3d 942, 950 (5th Cir. 2020) ("[U]sing moderate force and applying handcuffs are not enough to convert a stop into an arrest."); *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993) ("Clearly, using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause."). In *Angulo*, a border case, "handcuffs were briefly applied to a suspect resisting a lawful inspection and refusing to comply with reasonable commands necessary to carry out such an inspection; they were removed promptly once Angulo reached the interview room and was frisked." *Angulo*, *supra*.

15

The court found the defendant's detention did not equate to an arrest; although, the court's ruling was based largely on the fact that the detention occurred at the border, where the government has plenary power to conduct routine searches and seizures without probable cause. *Id*. at 949.

Despite the foregoing jurisprudence, "[I]nvoluntary transport to a police station for questioning is 'sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause.'" *Kaupp*, 538 U.S. at 630, quoting *Hayes v. Florida,* 470 U.S. 811, 815 (1985). See also *Dunaway v. New York*, 442 U.S. 200, 212 (1979), where the petitioner "was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room," and was, thus, arrested.

The Government contends that Defendant was not arrested, because he was free to leave prior to being taken to the post office for further questioning. The Government argues that Defendant was handcuffed for security reasons pursuant to OIG standard protocol regarding transportation of any individual in an OIG vehicle. Agent Alwell testified that had Defendant not agreed to return to the post office for further questioning, the agents could have left him at the scene, where he had neither vehicle nor phone, both having been confiscated by the agents.

These circumstances also warrant consideration of whether Defendant was in custody, a consideration typically addressed in the *Miranda* context.

16

A suspect is "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. The requisite restraint on freedom is greater than that required in the Fourth Amendment seizure context. The critical difference between the two concepts is that custody arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest.

Whether a suspect is "in custody" is an objective inquiry that depends on the "totality of circumstances." The subjective views harbored by either the interrogating officers or the person being questioned are irrelevant. The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances.

Recognizing that no one fact is determinative, this court has repeatedly considered certain key details when analyzing whether an individual was or was not in custody. Important factors include: (1) the length of the questioning, (2) the location of the questioning, (3) the accusatory, or non-accusatory, nature of the questioning, (4) the amount of restraint on the individual's physical movement, [and] (5) statements made by officers regarding the individual's freedom to move or leave.

*United States v. Wright,* 777 F.3d 769, 774–75 (5th Cir.2015) (cleaned up).

In a factually similar case, the Eleventh Circuit considered whether a mail carrier was in custody while being interviewed by postal inspectors at the post office:

Although there were some factors to suggest the interview was custodial in nature, such as: (1) when a team of U.S. postal inspectors stopped Maldonado while she was working her delivery route, they

17

effectively blocked in her mail truck and appeared to indicate that returning with them to the post office was mandatory; and (2) prior to the start of the interview at the post office, a female postal inspector accompanied Maldonado to the restroom and refused to let Maldonado close the door. These facts, however, do not render this a custodial interrogation because: (1) Maldonado was unambiguously told that she was free to leave, was not in custody, and did not have to answer questions; (2) she was "in the familiar ... surroundings" of her workplace; (3) she was not physically restrained during questioning; (4) the postal inspectors did not brandish their weapons when they first approached Maldonado on her delivery route, or later during the interview; (5) although a postal inspector accompanied Maldonado to the restroom for safety reasons, Maldonado's movements were never restricted and she was free to leave at any time; and (6) after the interview was over, Maldonado left voluntarily and was not arrested until approximately six weeks later.

*United States v. Maldonado*, 562 F. App'x 859, 861–62 (11th Cir. 2014) (citations omitted), cited with approval by *United States v. Ortiz*, 781 F.3d 221, 233 (5th Cir. 2015).

In this case, the evidence does not unambiguously show that Defendant knew he was free to leave. Although the agents testified that Defendant was free to leave if he did not wish to answer further questions, Defendant testified that none of the agents ever told him he was free to go. (Rec. Doc. 92, p. 58). Defendant further testified that after the agents stopped him, patted him down, refused to answer his questions, reviewed his text messages with Johnson, and "guided" him down to sit on the bumper, the agents patted him down again and handcuffed him. (Rec. Doc. 92, p. 53-58). Further, Agent Alwell testified that Defendant's freedom to leave was complicated by the caveat that he was nonetheless required to report to postal management for processing. (Rec. Doc. 81, p. 98). This could have been a nearly

18

impossible task without a vehicle or phone. Considering the totality of the circumstances, the Court finds that the weight of the evidence tips in favor of arrest.

Regardless of whether Defendant was "arrested," it is undisputed that Defendant was at least detained after the agents reviewed his text messages. The question, then, is whether the prolonged detention was reasonably related in scope to the initial traffic stop, the second *Terry* inquiry. The Court reiterates that detention is only reasonable to the extent the officer's initial suspicions are verified or dispelled. In *United States v. Zavala*, the Fifth Circuit held that the defendant's detention "which exceeded one hour and thirty minutes, morphed from a *Terry* detention into a de facto arrest." *United States v. Zavala*, 541 F.3d 562, 579–80 (5th Cir. 2008). In that case, the defendant "was handcuffed, placed in a police car, transported to different locations, and was not free to leave." *Id*. The court further reasoned:

> Although we have held that the police officer can detain a defendant after a traffic stop until a computer check comes back clean, *see, e.g., United States v. Zucco,* 71 F.3d 188, 191 (5th Cir.1995) (nine minute detention), we have never held that a police officer may detain a defendant for one hour and thirty minutes until a full-blown drug investigation is completed…In this case, the agents detained Zavala for one hour and thirty minutes without knowing whether Rivera would confess or whether drugs would be discovered.
>
> Based on the particular facts of this case, the length of Zavala's detention exceeded the outer bounds of a valid *Terry* detention. Zavala (and his cell phone) should have been released after the first search of the Taurus failed to uncover any drugs.

19

*Id.* (footnote omitted).

The foregoing reasoning guides this case. Defendant's text messages with Johnson revealed ongoing communications regarding the delivery of multiple packages to addresses other than as labelled. The text messages do not suggest that the packages contained anything illegal or that Johnson was engaged in narcotics trafficking. Additionally, the messages do not reveal that Defendant accepted any money from Johnson for diverting the packages. In other words, the text messages do not support that Defendant was engaged in a crime such that the agents were justified in further detention.

Agent Alwell testified that Defendant later told agents during subsequent questioning at the post office that he had been paid to deliver the packages. (Rec. Doc. 81, p. 24). Also, according to Agent Alwell, Defendant told agents during the interview that he considered the packages suspicious and that he had researched the sender's address and found that it did not exist. (Rec. Doc. 81, p. 80). While these facts could conceivably confirm the agents' initial suspicions, the agents did not uncover these facts until *after* Defendant had been handcuffed and transported to the post office.

Considering the totality of the circumstances, the Court finds that Defendant was seized for Fourth Amendment purposes at the time he was handcuffed, placed in the back of an agent's vehicle, and taken back to the post office where he was

photographed, interrogated, and accused of lying. (Rec. Doc. 92, p. 86; Rec. Doc. 69-3). If he was free to leave prior to the transport, as the Government contends, the Government failed to present convincing evidence that Defendant *knew* he was free to leave. A reasonable person in Defendant's position at that moment (after the agent's initial questioning and review of the text messages)—handcuffed, without phone or vehicle, and compelled to return to the post office for processing with his supervisor—would not have felt free to leave.

## IV.  <u>Whether probable cause supported the arrest.</u>

Having found that Defendant was arrested at the time he was taken back to the post office for interrogation, the Court must determine whether the arrest was supported by probable cause.

> Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. Importantly, the facts must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest.

*Lincoln*, 874 F.3d at 842 (cleaned up).

At the time Defendant was handcuffed and placed in the back of an agent's vehicle for transport, the agents knew 1) the packages in question were suspicious; 2) a narcotics canine alerted to the presence of drugs in the packages; 3) Defendant had on prior occasions diverted suspicious packages from their written addresses

(Rec. Doc. 81, p. 68-69; 72-73; 82-83); and 4) that Defendant had an ongoing text message relationship with the packages' intended recipient, Johnson, regarding delivery of the packages, including that the packages were going to multiple different addresses and that Johnson often changed his phone number (Rec. Doc. 67-2).

The Court emphasizes what the text messages did *not* say: that the packages contained anything illegal, that Johnson was engaged in narcotics trafficking, or that Defendant accepted any money from Johnson for diverting the packages. Additionally, there no evidence that Defendant was engaged in criminal wrongdoing by delivering packages to an individual known to often change his phone number. Considering all the evidence, the Court finds that the agents did not have probable cause to suspect Defendant was involved in a crime before arresting him. The agents did not learn that Defendant allegedly accepted money for the diverting the packages or that Defendant knew the packages were suspicious until the subsequent interview at the post office. See *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) ("The facts must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest.")

In comparison, in *United States v. Ruffin,* 783 F. App'x 478, 480 (6th Cir. 2019), *cert. denied,* 140 S. Ct. 2749, 206 L. Ed. 2d 923 (2020), the mail carrier involved in a drug delivery scheme scanned packages as delivered, but instead put

them into her personal vehicle and personally delivered them to the drug house. Here, the evidence shows that Defendant properly scanned the packages as delivered and simply met with Johnson to deliver the packages as Johnson requested. (Rec. Doc. 92, p. 24). Defendant presented evidence that postal carriers are permitted to deliver packages other than as addressed based on the carrier's familiarity with a customer. While the evidence does not show that Defendant had a particularly meaningful relationship with Johnson, the evidence supports that Defendant was at least familiar enough with Johnson that diverting packages per his (Johnson's) request should not be considered illegal, based on all the evidence known to the agents at the time Defendant was handcuffed and transported to the post office. Accordingly, the Court finds that probable cause did not exist at the time of Defendant's arrest. As such, the Court recommends that Defendant's Motion to Suppress be granted.

## Conclusion

For the reasons discussed herein, it is recommended that Defendant's Motion to Suppress (Rec. Doc. 31; 41; 50) be GRANTED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed. R. Crim. P. 59(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after

being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Crim. P. 59(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 28th day of July, 2021.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE